## GRANT v. COMMONWEALTH.

Court of Appeals of Kentucky.
June 12, 1951.

Court, charged with the wilful murder of Charlie Isaacs, and at a trial on October 18, 1950, he was convicted of voluntary manslaughter and his punishment fixed at confinement in the penitentiary for 21 years. He appeals, urging the following grounds for reversal:

(1) Because incompetent evidence was admitted to show that he was guilty of other crimes than the one for which he was tried; (2) because the commonwealth's attorney waved before the jury a photograph of deceased which showed profuse blood stains on the dead person's body and clothing, and this, he claims, had the effect of unduly prejudicing the minds of the jury; (3) because the trial court admitted incompetent evidence and rejected competent evidence; (4) because the instructions to the jury were confusing; (5) because the commonwealth's attorney made an unfair and prejudicial argument to the jury; and (6) because the verdict of the jury was the result of prejudice and passion and is contrary to law.

The incident occurred at the home of deceased, just off Highway 25 on a side road and 2½ miles south of Berea, Kentucky. The house in which Isaacs was killed is little more than a one-room shack, approximately 20 feet long and 12 feet wide, the front of which is almost flush with the road. There is a door in the center of the front, or in the north end of the house, with windows flanking it on both sides. A small square hole in the wall at the back with no glass in it serves as the only other window.

Bertha Isaacs, the wife of deceased, and Gertie Isaacs, their 16 year old daughter, were the only eyewitnesses to the tragedy who testified for the Commonwealth. Substantially, their evidence is that on August 14, 1950, at approximately 10:00 a. m., Charlie Isaacs, Bertha, his wife, and Gertie, his daughter, were seated on a bench in front of their home. Visiting with them was a neighbor, Wallace Byrd, but he left before any trouble started. Near by, lying on the ground asleep and dead-drunk, was Carlo Lunsford, known as "Good Buddy". Grant rode up in a one-ton pick-up truck that was driven by Lewis Wrenn, which he parked at an angle in front of Isaacs' house.

George T. Ross, Thomas D. Shumate and James S. Chenault, all of Richmond, for appellant.

A. E. Funk, Atty. Gen., Zeb A. Stewart, Asst. Atty. Gen., for appellee.

STEWART, Justice.

Appellant, Ray Grant, was indicted at the October term, 1950, of the Madison Circuit

Although Isaacs spoke to them and asked them to get out and stay awhile, they remained in the truck and Grant said: "No. Haven't got time." Isaacs walked over to the truck and Grant started the conversation by asking him to pay a debt he owed him, saying: "You owe me for rent, a light bill, a washing machine and some more money besides." Then Isaacs answered, "If I owe you any money, I will pay you." Grant replied, "You are a dirty, low-down son-of-a-bitch; you won't pay anybody." Later they heard Grant say, "You told Arthur Owens you were going to turn me up to the law." Isaacs denied that he had made this statement and replied; "Boys, if you are here for trouble, I don't want any." He turned away and walked into the house and Bertha Isaacs immediately followed him. As they were entering the house Grant said, "I will kill you." Bertha Isaacs said she looked back at this remark and saw Grant holding a pistol out of the truck window, pointing it toward her husband, who was then standing in the rear of the one-room house. She yelled, "Watch out, daddy, Ray is going to shoot." Isaacs started to turn, got half way around, when Grant shot once through the east front window of the house. The bullet entered the fleshy part of decedent's left arm, went straight through his heart region, and stopped just under the skin near his back bone. Isaacs died almost immediately. He had no weapon in his hands at the time, but a small sawed-off pistol was found in his pocket, which, when it was inspected, had no cartridges in it. No other gun of any description was located in the house after a search.

Ray Grant testified that he went with Lewis Wrenn in the latter's truck on the day of the killing, looking for Good Buddy. He took with him a .45 automatic pistol, which he placed in the open glove compartment of the truck, having taken it out of his car because he said he didn't want to leave it there. After traveling for sometime, Wrenn and Grant came back by deceased's home. They stated that they stopped when they saw Good Buddy lying in the yard, although they had intended to go on. Grant said that after Wrenn's truck

had been parked at an angle in front of deceased's home, Isaacs walked over to them and they started talking to each other. Grant asked Isaacs to pay a little on the debt he owed him. Grant stated that when he mentioned the light bill and the rent, Isaacs started cursing and ranting, contending that the rent was too high and that he had already paid the light bill. Grant said he smelled whiskey on Isaacs' breath and, as he didn't want to have any trouble with him, he attempted to end the conversation by informing Isaacs that he would pay the light bill himself and, we quote, "send the law down to get my washing machine." When this statement was made, Isaacs flew into a fit of rage and replied, "I will law with you and pay you right now. You god-damn son-of-a-bitch, I will kill you." Isaacs then ran into the house, grabbed a shot gun off the wall, wheeled around with it and advanced toward Grant with the weapon. Appellant, fearing for his own safety, grabbed his pistol out of the glove compartment and shot once at Isaacs who, Grant said, was now in the front part of his house. He and Wrenn soon left the scene of the trouble, after placing Good Buddy in the back of the truck. Wrenn, who was jointly indicted with Grant for the murder of Isaacs, corroborated Grant's version of the killing.

Appellant's counsel takes vigorous exception in his brief to the testimony of Bertha Isaacs, brought out by the prosecution, that Grant and deceased had been partners in the illicit whiskey business when the Isaacs lived in one of Grant's houses. Bertha Isaacs was asked by counsel for appellant, by way of accusing her of withholding part of her testimony, if she had not stated on another trial of this case that she heard Grant make this statement to her husband just before the killing: "Charley, I heard you were going to turn me up to the law." The Commonwealth, when its turn came to exploit the meaning of this remark, asked many questions to establish the fact that Bertha Isaacs and her husband during various periods in the past had sold "bootleg" liquor for Grant, and that they had recently moved out of a house belonging to Grant because, according to

Bertha Isaacs, "We took a notion to quit ('bootlegging') so we moved out of his house."

■ Six times, while the Commonwealth was developing this evidence, counsel for appellant moved the court to set aside the swearing of the jury and continue the case, but the lower court refused to act upon his request. To admit evidence of a different crime from that for which Grant was tried was prejudicial error, he argues. We are convinced that appellant's counsel made this evidence admissible when he himself opened up the subject, or, as the trial judge described it, when he "laid down the bars", during his cross-examination of Bertha Isaacs. It was held in Colley v. Commonwealth, 232 Ky. 590, 24 S.W.2d 280, that evidence was competent to prove that Colley and the man he killed had been engaged in the illicit manufacture of whiskey, because such testimony was a material fact that showed the relationship of the two persons. Appellant's objection on this point cannot be sustained and it follows that the lower court properly refused to discharge the jury and continue the case.

Appellant's contention that the commonwealth's attorney waved a gory picture of deceased before the jury is without foundation; for nowhere in the record is there any proof that this action really occurred. On page 54 of the transcript of evidence, appellant's counsel objected to the conduct of the commonwealth's attorney in waving a picture, but the picture there was one of the room and not one of the body. On page 90 of the transcript of evidence, the prosecution did attempt to introduce this particular picture in evidence but the trial court excluded it. Therefore, it is well established by the record that the picture in controversy here was never shown at any time to the jury.

■ The additional incompetent evidence complained of by appellant is directed at the testimony of W. E. Davis who stated that he heard Grant make a threat against deceased in Berea, Kentucky, some fifteen months prior to Isaacs' death, in these words: "I will get even with you. I will take care of you sometime." Appellant in-

sists that this testimony by reason of its remoteness was incompetent and prejudicial both as substantive evidence and for the purpose of impeaching Grant. In Abbott v. Commonwealth, 24 Ky.Law Rep. 148, 68 S.W. 124, this Court ruled that a threat made by Abbott against the person he killed one year before the time he perpetrated the murder was admissible, and that the remoteness in point of time prior to the homicide goes merely to the weight and not to the competency of the threat as evidence. See also Crum v. Commonwealth, 202 Ky. 374, 259 S.W. 708; 26 Am.Jur., Homicide, Section 357, p. 403. However, the record as a whole reveals that these two men had maintained a feeling of enmity toward each other even beyond the time the threat in question was made, although, in their dealings with each other, they appeared on the surface to be on friendly terms.

■ The Commonwealth proved on rebuttal by C. C. Hensley, a deputy sheriff, that Grant's general moral character was bad. Appellant's counsel sought on cross-examination of Hensley to impeach Bertha Isaacs' character for morality, but the lower court refused to allow Hensley to testify on this point because he was the Commonwealth's witness. An avowal in the record indicates that Hensley would have described Bertha Isaacs to be a person of bad moral character, if he had been permitted to answer concerning her. This action upon the part of the trial judge in refusing to allow Hensley to testify as to Bertha Isaacs' character was erroneous. See Jackson v. Commonwealth, 17 Ky.Law Rep. 1350, 34 S.W. 901. However, the exclusion of this testimony in this instance does not in our opinion prejudice the cause of appellant, since the proof at the trial, taken in its entirety, shows rather conclusively that Bertha Isaacs' general reputation throughout most of her adult life had been anything but commendable.

■ Appellant argues that Instructions I, II and V, prepared and given by the circuit court, were erroneous. Instruction I, he contends, should have included the phrase "not in his necessary or apparent necessary self-defense," instead of the lan-

guage "when it did not reasonably appear to him to be necessary as explained by the II Instruction." As to Instruction II, he charges that it omitted the words "that defendant believed it necessary to shoot", whereas, this instruction said instead "that it reasonably appeared to him to be necessary to so shoot." The gist of appellant's complaint as regards the two instructions is that the lower court did not give to the jury a proper instruction in his behalf on self-defense. This is pointless, since Instruction II followed substantially the wording for a self-defense instruction set forth in Section 868 of Stanley's Instructions to Juries. There is likewise no merit to appellant's insistance that it was error for the lower court to incorporate the instructions on murder and manslaughter in Instruction I. Instructions on murder and manslaughter are frequently combined in one instruction as here, but we have held it is better practice to give a separate instruction as to each. Strange v. Commonwealth, 254 Ky. 57, 70 S.W.2d 972. Instructions V told the jury, in substance, to find Grant not guilty if it entertained a reasonable doubt as to his guilt, but that, if it believed beyond a reasonable doubt that he was guilty, to convict him of the crime of voluntary manslaughter if it did not believe beyond a reasonable doubt that he was guilty of murder. The lower court had already defined the distinction between the two crimes in Instruction I. Instruction V does not direct the jury to find Grant guilty, as appellant insists. Instruction V follows substantially the "reasonable doubt" model approved for a homicide case in Section 868 of Stanley's Instructions to Juries.

In his closing argument to the jury, the commonwealth's attorney made this remark: "This man Grant joined the army before war started and gets home before shooting gets rough and now wants to parade himself before this jury as a patriotic man." This statement grew out of the testimony of appellant himself on direct examination. Grant's counsel, to gain sympathy for appellant, asked Grant about his service record in the army. Later, on re-cross-examination, appellant was further questioned by his attorney about his army career. It developed that he had been in the army from 1940 to 1943 and had spent the entire time in the Panama Canal Zone. The commonwealth's attorney in his argument to the jury on this point made a statement that was certainly uncharitable and which was out of place under the circumstances. However, we do not conclude that the above language was entirely outside the record, nor do we hold that the remark constitutes a reversible error.

Appellant finally concentrates all of the alleged errors we have examined herein into one claim, namely, that, because of them, he did not have a fair and impartial trial, so that the verdict of the jury was the result of prejudice and passion and therefore contrary to law. We are not persuaded by this argument. As we view the evidence in this case, we are forced to believe that Grant was unusually fortunate in escaping with so light a sentence, because the proof brought out against him would have upheld life imprisonment or justified even a death sentence at the hands of the jury.

The judgment is affirmed.